**LAGOMARSINO LAW**
ANDRE M. LAGOMARSINO, ESQ. (NV Bar No. 6711)
TAYLOR N. JORGENSEN, ESQ. (NV Bar No. 16259)
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
Facsimile: (702) 383-0065
AML@lagomarsinolaw.com
Taylor@lagomarsinolaw.com
*Attorneys for Plaintiff Jordyn Jamison*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JORDYN JAMISON, individually,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN AFFILIATE CO. LLC;<br><br>Defendant. | CASE NO.:<br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

Plaintiff JORDYN JAMISON, by and through her counsel of record, ANDRE M. LAGOMARSINO, ESQ. and TAYLOR N. JORGENSEN, ESQ. of LAGOMARSINO LAW, files the following *Complaint and Jury Demand*, alleging and complaining as follows:

## JURISDICTION AND VENUE

1. This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

2. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (1) civil action authorized by law to be brought by any person to redress the deprivation, under the color of any state law, statute, ordinance, regulation, custom or usage, or any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (2) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

3. This Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

4. Venue in this District is proper under 28 U.S.C. § 1391 because all facts pled and all acts and omissions giving rise to this Complaint occurred in Las Vegas, Nevada, within the District of Nevada, and all the parties reside in the District of Nevada.

5. All procedural prerequisites for filing this suit have been met. Plaintiff JORDYN JAMISON (hereinafter "JAMISON" or "Plaintiff") timely filed a Charge of Discrimination alleging discrimination and retaliation against Defendants with the Nevada Equal Rights Commission ("NERC") and the Equal Opportunity Rights Commission ("EEOC"). The NERC issued a Right to Sue on September 26, 2023. This Complaint and Jury Demand is being filed within ninety (90) days of Plaintiff's receipt of that Notice of Right to Sue.

## IDENTIFICATION OF PARTIES

6. At all relevant times, Plaintiff JORDYN JAMISON was, and is, a resident of Clark County, Nevada.

7. Upon information and belief, and at all relevant times herein, Defendant AMERICAN AFFILIATE CO. LLC, (hereinafter "AMAFF") was, and is, a foreign limited-liability company, registered and doing business in Clark County, Nevada.

8. At all relevant times, Plaintiff JORDYN JAMISON was an employee of AMAFF, as defined by law and related to the causes of action set forth herein.

9. At all relevant times, Defendant AMAFF was a covered entity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

## GENERAL ALLEGATIONS

10. Plaintiff incorporates and realleges Paragraphs 1 through 9 of this Complaint as though fully set forth herein.

11. Plaintiff JAMISON began working for AMAFF on or about April 30, 2021, as a "Sales Representative."

12. JAMISON performed her job satisfactorily and, to her knowledge, did not receive any disciplinary action during her employment with AMAFF.

13. AMAFF is a self-described "Live Activation company" in the sports betting, iGaming, and cashless industry.

14. At all times relevant herein, AMAFF provided marketing services to BetMGM, which is the exclusive sports betting partner to MGM Resorts nationwide.

15. AMAFF employs sales representatives, like JAMISON, to go to the various BetMGM-affiliated sportsbooks in Las Vegas, Nevada, and sign-up new customers for BetMGM's mobile/online betting application (the "app").

16. AMAFF provided similar services to other sports betting companies that services other hotels in the Las Vegas, Nevada area.

17. AMAFF provided its sales representatives with the uniform for their assigned locations, set the sales representatives' work schedules, and provided them with the technology and supplies to complete their job duties.

18. Immediately after JAMISON began working as a sales representative for AMAFF, she was subjected to sexual harassment by the potential customers she was tasked with interacting with and signing up.

19. The sexual harassment occurred during nearly every shift that JAMISON worked for AMAFF.

20. On her first day, JAMISON was training with Mark Fragassi, an AMAFF Assistant Market Manager.

21. A guest approached both JAMISON and Fragassi and JAMISON pitched the sportsbook's mobile application to him. The guest promptly handed JAMISON a business card and told her that he would love to take care of her and for JAMISON to be his "sugar baby."

22. The guest offered to take care of JAMISON financially if she took care of him sexually.

23. After witnessing this, Fragassi laughed and made a joke about the encounter to JAMISON.

24. On or about April 2021, while working at the Green Valley Ranch Casino, JAMISON was approached by a regular guest who frequently tried to interact with her while she worked.

25. After rebuffing the guest several times, the guest cornered JAMISON and began caressing her hand.

26. The guest did not back away from JAMISON until the shift lead on duty approached them and asked if JAMISON was okay.

27. Later, JAMISON was moved to MGM Grand Sportsbook properties on behalf of AMAFF.

28. On or about February 2022, during Superbowl weekend, JAMISON was assigned to work at the Bellagio Casino sportsbook.

29. After what seemed like a normal interaction with a guest and potential BetMGM customer, the guest kissed JAMISON on the cheek without her consent.

30. AMAFF's lead on shift, Carla Clark, observed the interaction but did nothing more than ask JAMISON about it after the fact.

31. The same guest continued to hang around the sportsbook area and the specific areas that JAMISON worked in.

32. That same weekend, JAMISON was assigned to work at the MGM Grand Casino sportsbook.

33. The same guest who kissed JAMISON without her consent showed up at the MGM Grand sportsbook and approached JAMISON. The guest asked if JAMISON was following him and proceeded to be flirtatious and make sexual innuendos to her.

34. JAMISON informed her lead on shift, Samantha Vasquez, about the events the day before and about the offending guest.

35. No steps were taken by AMAFF to address the guest.

36. On or about March 2022, during March Madness events, the sexual harassment got worse.

37. One week therein, JAMISON was assigned to work at the Luxor Casino sportsbook for a Thursday through Sunday stint.

38. That Thursday, a guest groped JAMISON and grabbed her butt.

39. That same day, another guest then attempted to touch her face and asked JAMISON to be his "sugar baby." This occurred while JAMISON was attempting to pitch the BetMGM app.

40. During that same stint, another guest made overtly sexual and inappropriate comments to JAMISON while she was pitching, or attempting to pitch, the BetMGM app.

41. During the same time frame, JAMISON approached four male customers to pitch the BetMGM app.

42. The four men were near the AMAFF lead on shift, Noel Rodriguez.

43. The group of men asked JAMISON if she was old enough to work in a sportsbook,

1  commented on how young she looked, and generally made comments about her body.

2  44.   One of the men walked up behind JAMISON and put his arm around her shoulders, pulling
3  him against her.

4  45.   The men surrounded JAMISON as they continued to harass her, and JAMISON attempted
5  to back up and away from the men.

6  46.   AMAFF lead Noel Rodriguez and some fellow employees watched these events unfold, but
7  no one did anything to intervene.

8  47.   JAMISON was eventually able to back away. She proceeded into the restroom, where she
9  had a panic attack.

10 48.   An MGM Resorts employee spoke with JAMISON and then called the Luxor sportsbook
11 manager to inform him of the incident.

12 49.   The Luxor sportsbook Manager told Vasquez that the men were probably just drunk, and
13 they shouldn't worry about it. The Manager declined to call security and the group of four men
14 remained in the sportsbook.

15 50.   Noel Rodriguez called AMAFF Market Development Manager Andre Borges and informed
16 her of the incident with JAMISON and the four men.

17 51.   Borges told Rodriguez to send JAMISON home.

18 52.   AMAFF took no action to address the rampant sexual harassment following this report.

19 53.   The following day, AMAFF moved JAMISON to the Mandalay Bay Hotel & Casino
20 sportsbook.

21 54.   JAMISON informed AMAFF shift lead Adriano Dos-Santos about what happened at the
22 Luxor sportsbook the day before.

23 55.   Dos-Santos told JAMISON to tell him if anything happened to her while on his team.

24 56.   That same day, JAMISON was assisting a customer when a previous customer from that
25 same day walked up to JAMISON, thanked her for helping him and pulled her into a side hug with
26 his arm low around her waist and their faces touching.

27 57.   JAMISON pulled away and the customer left.

28 58.   JAMISON reported the incident to Dos-Santos, who then brought Cassie Brickman, the CEO

1   of AMAFF, over to speak with JAMISON.

2   59.   JAMISON told Brickman about the incident that had just occurred, everything that had
3   happened both in the days prior, and the pattern of customer sexual harassment that occurred during
4   her time with AMAFF.

5   60.   Brickman told JAMISON to go home and to take the next day off. Brickman told JAMISON
6   she would be paid for this time because the harassment was not her fault.

7   61.   JAMISON was not paid for the time Brickman told her to take off.

8   62.   Sometime after March Madness 2022, JAMISON's was assigned a new manager named
9   Traci Chandler.

10  63.   JAMISON scheduled a meeting with Chandler to tell her about the sexual harassment she
11  had been experiencing and how it made her feel unsafe.

12  64.   Chandler said that she would work with JAMISON and help to make sure she felt safe while
13  performing her job duties.

14  65.   Chandler never provided any such help and made no effort to enact policies or procedures to
15  better protect AMAFF employees.

16  66.   Sometime after, JAMISON was assigned to the Mirage Casino sportsbook under AMAFF
17  shift lead Eleni De Souza.

18  67.   On one occasion, a frequent Mirage sportsbook customer began talking to JAMISON and
19  making comments about how pretty she was and how lucky her boyfriend was.

20  68.   The customer then pulled JAMISON against him by her waist and held her there harder when
21  JAMISON tried to resist.

22  69.   JAMISON reported this to De Souza, who told the guest that he could not touch the
23  employees. No other action was taken.

24  70.   Later, another guest at the Mirage backed JAMISON into a literal corner, trapping her
25  between a desk and his own body.

26  71.   This guest told JAMISON's co-worker, who witnessed the event but did not interfere, that
27  he found JAMISON pretty.

28  72.   The guest proceeded to try and touch JAMISON's hair and/or face. When she moved to

avoid being touched, the guest commented "Aww, someone is nervous."

73. JAMISON proceeded to tell the guest that she did not want to be touched. The guest then turned to JAMISON's coworker and made a derogatory remark about her before leaving.

74. JAMISON suffered a panic attack after this interaction.

75. On a later occasion at the Mirage sportsbook, JAMISON was assisting a group of men with signing up for the BetMGM app when they began harassing her.

76. One man began to touch JAMISON's arm, but in a rare show of manners, another in the group of men told him not to touch people without their consent.

77. The group changed the topic of conversation while trying to finish the sign-up process, and JAMISON was asked if she had any pets. JAMISON informed the group that she had a pet snake.

78. One of the men looked at another, smiled, then commented something along the lines of "she loves snakes, you still have a chance," while looking at motioning at his genitals.

79. JAMISON reported this incident to De Sousa. AMAFF did nothing to address it nor did it enact any policy changes to provide better security.

80. In and around November 2022, JAMISON was working at the Aria Casino Sportsbook and helping a male customer when he commented that had she been a little younger (she was twenty-two years old at the time), he would ask her out.

81. JAMISON walked away from the customer and reported it to AMAFF shift lead Marklyn Martinez.

82. In a break from AMAFF's pattern of not doing anything to address the harassment that JAMISON suffered, Martinez reported the man to the sportsbook security and he was escorted out.

83. However, AMAFF still did nothing to provide better security to its employees to avoid these situations all together. As such, the overt harassment continued.

84. In and around December 2022, while working at the Aria Casino Sportsbook, a male customer cornered JAMISON between a railing, a trash can, and his body.

85. JAMISON was unable to move unless she physically pushed the customer.

86. The customer grabbed JAMISON and pulled her towards him, then began making comments about her appearance and body.

87. JAMISON could not locate her shift lead from where she was at. Another AMAFF coworker witnessed the incident but did not intervene.

88. The customer did not leave JAMISON alone until his group left several minutes later.

89. JAMISON suffered a panic attack as a result of the interaction.

90. After the panic attack subsided, JAMISON's supervisor Traci Chandler saw her.

91. JAMISON reported the incident to Chandler.

92. Chandler told JAMISON that 'maybe the job wasn't for her' and that she should try a different position.

93. Chandler took no action to address the persistent sexual harassment that JAMISON experienced in the workplace.

94. There were no other positions available to JAMISON that provided comparable compensation.

95. During 2023, JAMISON's coworker, Jamie Campbell, was working at the Bellagio Casino Sportsbook when a customer came up to her and specifically asked where JAMISON was.

96. The customer told Campbell that he wanted to find JAMISON because he was in love with her. JAMISON had no idea who the man was.

97. JAMISON was scheduled to work at the Bellagio Sportsbook the next day. The customer returned and watched JAMISON throughout her shift.

98. JAMISON informed her shift lead that day, Dos Santos, about what had happened. The only action taken was to keep an eye on the customer.

99. Still, AMAFF took no action to address the persistent sexual harassment that JAMISON experienced.

100. JAMISON was subjected to some form of sexually inappropriate, harassing, or threatening comments and conduct nearly every, if not every, shift that she worked for AMAFF.

101. These incidents were frequently witnessed by AMAFF employees and shift leads or reported to Chandler or Brickman directly by JAMISON.

102. At all times relevant herein, Chandler and Brickman had the ability to take tangible employment action against JAMISON, such as scheduling her to work properties with significantly

lower earnings opportunities and fewer customers.

103. Additionally, and at all times relevant herein, Chandler and Brickman had the ability to address the lack of security which AMAFF provided its employees but chose not to.

104. Despite having knowledge of the unsafe working conditions, AMAFF took no steps to address the constant harassment that JAMISON suffered while working in her capacity as a sales representative for AMAFF.

105. AMAFF did not provide any form of security to its employees outside of the security employed by whatever sportsbook they were working that day.

106. Upon information and belief, that security was no primarily tasked with protecting AMAFF employees.

107. After continually reporting these incidents to her superiors, AMAFF began scheduling JAMISON to work at properties which made less money and had fewer customers.

108. Eventually, AMAFF stopped putting JAMISON on the schedule completely.

109. This affected JAMISON's income and damaged her financially.

110. JAMISON further suffered severe panic attacks, embarrassment, humiliation, and fear as a result of the constant sexual harassment.

**FIRST CLAIM FOR RELIEF**

**Sexual Discrimination in Violation of Title VII of the 1964 Civil Rights Act,**

**42 U.S.C. § 2000e *et seq.* ("Title VII")**

111. Plaintiff incorporates and realleges Paragraphs 1 through 110 of this Complaint as though fully set forth herein.

112. JAMISON was subjected to sexual discrimination by AMAFF when, despite its knowledge of the sexual harassment she experienced while working in her position as a sales representative, AMAFF did nothing to address the problem.

113. As a female, JAMISON is a member of a protected class.

114. During all relevant times, JAMISON's performance as a sales representative for AMAFF was satisfactory.

115. In the course and scope of her job duties, JAMISON experienced constant sexual harassment

by male customers, including but not limited to, sexually inappropriate jokes and comments, non-consensual touching and kissing, and being cornered into small spaces.

116. On numerous occasions throughout her employment, JAMISON reported individual instances of harassment to her shift leads and informed high-ranking supervisors, such as Brickman and Chandler, of the history of such events.

117. After JAMISON continued experiencing and reporting these events, she was consistently placed at properties with low earnings and fewer customers, which negatively affected her commission.

118. Eventually, AMAFF stopped putting JAMISON on the schedule at all.

119. Brickman and Chandler had the ability to enact new policies to better protect AMAFF employees like JAMISON but chose not to.

120. JAMISON experienced adverse employment actions as a result of reporting inappropriate and intimidating customer behavior.

121. AMAFF employees who did not experience this treatment, or who did but did not report it, were not consistently placed at low-earning properties and/or taken off of the AMAFF schedule.

122. The conduct as set forth above constitutes violations of Title VII. AMAFF through their agents and employees, subjected JAMISON to unlawful discrimination as prohibited by Title VII.

123. At all times relevant to JAMISON's allegations herein, Brickman and Chandler were acting within the course and scope of their employment with AMAFF.

124. AMAFF is therefore liable for Brickman's and Chandler's discriminatory acts and omissions.

125. As a direct and proximate result of AMAFF's conduct, JAMISON has suffered, and continues to suffer, irreparable injury and monetary damages in the form of past, present, and future lost earnings and other benefits; great emotional distress, mental harm, pain and suffering; and other related damages.

126. AMAFF's conduct was willful, intentional, oppressive, malicious, and done with wanton and reckless disregard for JAMISON's rights, thereby warranting the imposition of punitive damages to be determined at trial.

127. As a result of AMAFF's conduct, JAMISON was required to retain the services of an attorney and, as a direct and foreseeable result, has been damaged and is entitled to reasonable attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

### Sexual Discrimination in Violation of NRS 613.330

128. Plaintiff incorporates and realleges Paragraphs 1 through 127 of this Complaint as though fully set forth herein.

129. JAMISON was subjected to sexual discrimination by AMAFF when, despite its knowledge of the sexual harassment she experienced while working in her position as a sales representative, AMAFF did nothing to address the problems.

130. As a female, JAMISON is a member of a protected class.

131. During all relevant times, JAMISON's performance as a sale's representative for AMAFF was satisfactory.

132. In the course and scope of her job duties, JAMISON experienced constant sexual harassment by male customers, including but not limited to, sexually inappropriate jokes and comments, non-consensual touching and kissing, and being cornered into small spaces.

133. On numerous occasions throughout her employment, JAMISON reported individual instances of harassment to her shift leads and informed high-ranking supervisors, such as Brickman and Chandler, of the history of such events.

134. After JAMISON continued experiencing and reporting these events, she was consistently placed at properties with low earnings and fewer customers, which negatively affected her commission.

135. Eventually, AMAFF stopped putting JAMISON on the schedule at all.

136. Brickman and Chandler had the ability to enact new policies to better protect AMAFF employees like JAMISON but chose not to.

137. JAMISON experienced adverse employment actions as a result of reporting inappropriate and intimidating customer behavior.

138. AMAFF employees who did not experience this treatment, or who did but did not report it,

were not consistently placed at low-earning properties and/or taken off of the AMAFF schedule.

139. The conduct as set forth above constitutes violations of NRS 613.330. AMAFF through their agents and employees, subjected JAMISON to unlawful discrimination as prohibited by NRS 613.330.

140. At all times relevant to JAMISON's allegations herein, Brickman and Chandler were acting within the course and scope of their employment with AMAFF.

141. AMAFF is therefore liable for Brickman's and Chandler's discriminatory acts and omissions.

142. As a direct and proximate result of AMAFF's conduct, JAMISON has suffered, and continues to suffer, irreparable injury and monetary damages in the form of past, present, and future lost earnings and other benefits; great emotional distress, mental harm, pain and suffering; and other related damages.

143. AMAFF's conduct was willful, intentional, oppressive, malicious, and done with wanton and reckless disregard for JAMISON's rights, thereby warranting the imposition of punitive damages to be determined at trial.

144. As a result of AMAFF's conduct, JAMISON was required to retain the services of an attorney and, as a direct and foreseeable result, has been damaged and is entitled to reasonable attorney's fees and costs.

### THIRD CLAIM FOR RELIEF

**Retaliation in Violation of Title VII of the 1964 Civil Rights Act,**

**42 U.S.C. § 2000e *et seq.* ("Title VII")**

145. Plaintiff incorporates and realleges Paragraphs 1 through 144 of this Complaint as though fully set forth herein.

146. JAMISON engaged in protected activity on numerous occasions throughout her employment with AMAFF when she complained to her supervisors about and explicitly reported the harassment she was subjected to by customers.

147. After JAMISON continued to experience these instances and report them, she began to be assigned to low earning properties with fewer customers.

148. Eventually, JAMISON stopped being scheduled to work for AMAFF at all.

149. JAMISON engaged in a protected activity by utilizing AMAFF's appropriate internal procedures to report the discriminatory, harassing, and hostile conduct she was subjected to by customers.

150. Instead of taking steps to protect its employee, AMAFF scheduled JAMISON at locations with fewer customers and eventually stopped scheduling her at all.

151. There is a clear link between JAMISON's protected conduct and the adverse employment action she experienced, as JAMISON was placed at low earning properties after she continually reported sexual harassment by customers.

152. The conduct as set forth above constitutes violations of Title VII. Defendant, through its agents and employees, unlawfully retaliated against JAMISON because she refused to stay silent about consistent sexual harassment on the job.

153. At all times relevant to JAMISON's allegations herein, Brickman and Chandler were acting within the course and scope of their employment with AMAFF.

154. AMAFF is therefore liable for Brickman and Chandler's discriminatory acts and omissions.

155. As a direct and proximate result of AMAFF's conduct, JAMISON has suffered, and continues to suffer, irreparable injury and monetary damages in the form of past, present, and future lost earnings and other benefits; great emotional distress, mental harm, pain and suffering; and other related damages.

156. AMAFF's conduct was willful, intentional, oppressive, malicious, and done with wanton and reckless disregard for JAMISON's rights, thereby warranting the imposition of punitive damages to be determined at trial.

157. As a result of AMAFF's conduct, JAMISON was required to retain the services of an attorney and, as a direct and foreseeable result, has been damaged and is entitled to reasonable attorney's fees and costs.

**FOURTH CLAIM FOR RELIEF**

**Retaliation in Violation of NRS 613.330**

158. Plaintiff incorporates and realleges Paragraphs 1 through 157 of this Complaint as though fully set forth herein.

159. JAMISON engaged in protected activity on numerous occasions throughout her employment with AMAFF when she complained to her supervisors about and explicitly the sexually harassing conduct she was subjected to by customers.

160. After JAMISON continued to experience these instances and report them, she began to be assigned to low earning properties with fewer customers.

161. Eventually, JAMISON stopped being scheduled to work for AMAFF at all.

162. JAMISON engaged in a protected activity by utilizing AMAFF's appropriate internal procedures to report the discriminatory, harassing, and hostile conduct she was subjected to by customers.

163. Instead of taking steps to protect its employee, AMAFF scheduled JAMISON at locations with fewer customers and eventually stopped scheduling her at all.

164. There is a clear link between JAMISON's protected conduct and the adverse employment action she experienced, as JAMISON's was placed at low earning properties after she continually reported sexual harassment by customers.

165. The conduct as set forth above constitutes violations of NRS 613.340. Defendant, through its agents and employees, unlawfully retaliated against JAMISON because she refused to stay silent about consistent sexual harassment on the job.

166. At all times relevant to JAMISON's allegations herein, Brickman and Chandler were acting within the course and scope of their employment with AMAFF.

167. AMAFF is therefore liable for Brickman and Chandler's discriminatory acts and omissions.

168. As a direct and proximate result of AMAFF's conduct, JAMISON has suffered, and continues to suffer, irreparable injury and monetary damages in the form of past, present, and future lost earnings and other benefits; great emotional distress, mental harm, pain and suffering; and other related damages.

169. AMAFF's conduct was willful, intentional, oppressive, malicious, and done with wanton and

1 reckless disregard for JAMISON's rights, thereby warranting the imposition of punitive damages to be determined at trial.

170. As a result of AMAFF's conduct, JAMISON was required to retain the services of an attorney and, as a direct and foreseeable result, has been damaged and is entitled to reasonable attorney's fees and costs.

## FIFTH CLAIM FOR RELIEF

**Hostile Work Environment in Violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII")**

171. Plaintiff incorporates and realleges Paragraphs 1 through 170 of this Complaint as though fully set forth herein.

172. As a female, JAMISON is a member of a class of persons protected by Title VII, which prohibits discriminatory conduct so severe and pervasive as to create a hostile work environment.

173. JAMISON was constantly subjected to unwelcome verbal and physical conduct based on her sex.

174. Specifically, as alleged herein, JAMISON was subjected to non-consensual physical contact, sexually harassing and demeaning comments, and being physically trapped and intimidated by customers.

175. These regular occurrences were humiliating and deeply triggering to JAMISON, who has her own history of personal trauma.

176. The discriminatory conduct was sufficiently severe and pervasive to alter the conditions of JAMISON's employment and create an abusive work environment in violation of Title VII.

177. The terms and conditions of JAMISON's employment were altered, as evidenced by the properties that JAMISON was scheduled to work at after continuously reporting these incidents.

178. The harassment JAMISON suffered was a direct result of her failure to conform with AMAFF's attitude that she should just deal with customer harassment and that it was no big deal. Employees who conformed were not scheduled for low earning properties and received preferential treatment from AMAFF.

179. JAMISON subjectively perceived the working environment to be hostile and abusive, as

shown by the facts above and the decline in her mental health.

180. Additionally, a reasonable person would consider JAMISON's work environment to be objectively hostile and/or abusive.

181. AMAFF, knew, or should have known, of the abusive and hostile work environment caused by its customers' sexually harassing behavior, but took no action to stop or prevent any of the unwanted and inappropriate conduct despite having notice of said behavior.

182. Specifically, as plead herein, Brickman and Chandler were on explicit notice of these occurrences.

183. The conduct as set forth above constitutes violations of Title VII. AMAFF, through its agents and employees, unlawfully subjected JAMISON to a hostile work environment because she refused to be silent about the sexual harassment and intimidation she was subjected to by customers.

184. At all times relevant to JAMISON's allegations herein, Brickman and Chandler were acting within the course and scope of their employment with AMAFF.

185. AMAFF is therefore liable for Brickman's and Chandler's discriminatory acts and omissions.

186. As a direct and proximate result of AMAFF's conduct, JAMISON has suffered, and continues to suffer, irreparable injury and monetary damages in the form of past, present, and future lost earnings and other benefits; great emotional distress, mental harm, pain and suffering; and other related damages.

187. AMAFF's conduct was willful, intentional, oppressive, malicious, and done with wanton and reckless disregard for JAMISON's rights, thereby warranting the imposition of punitive damages to be determined at trial.

188. As a result of AMAFF's conduct, JAMISON was required to retain the services of an attorney and, as a direct and foreseeable result, has been damaged and is entitled to reasonable attorney's fees and costs.

### SIXTH CLAIM FOR RELIEF

**Hostile Work Environment in Violation of NRS 613.330**

189. Plaintiff incorporates and realleges Paragraphs 1 through 188 of this Complaint as though fully set forth herein.

190. As a female, JAMISON is a member of a class of persons protected by Title VII, which prohibits discriminatory conduct so severe and pervasive as to create a hostile work environment.

191. JAMISON was constantly subjected to unwelcome verbal and physical conduct based on her sex.

192. Specifically, as alleged herein, JAMISON was subjected to non-consensual physical contact, sexually harassing and demeaning comments, and being physically trapped and intimidated by customers.

193. These regular occurrences were humiliating and deeply triggering to JAMISON, who has her own history of personal trauma.

194. The discriminatory conduct was sufficiently severe and pervasive to alter the conditions of JAMISON's employment and create an abusive work environment in violation of Title VII.

195. The terms and conditions of JAMISON's employment were altered, as evidenced by the properties that JAMISON was scheduled to work at after continuously reporting these incidents.

196. The harassment JAMISON suffered was a direct result of her failure to conform with AMAFF's attitude that she should just deal with customer harassment and that it was no big deal. Employees who conformed were not scheduled for low earning properties and received preferential treatment from AMAFF.

197. JAMISON subjectively perceived the working environment to be hostile and abusive, as shown by the facts above and the decline in her mental health.

198. Additionally, a reasonable person would consider JAMISON's work environment to be objectively hostile and/or abusive.

199. AMAFF, knew, or should have known, of the abusive and hostile work environment caused by its customers' sexually harassing behavior, but took no action to stop or prevent any of the unwanted and inappropriate conduct despite having notice of said behavior.

200. Specifically, as plead herein, Brickman and Chandler were on explicit notice of these

occurrences.

201. The conduct as set forth above constitutes violations of NRS 613.330. AMAFF, through its agents and employees, unlawfully subjected JAMISON to a hostile work environment because she refused to be silent about the sexual harassment and intimidation she was subjected to by customers.

202. At all times relevant to JAMISON's allegations herein, Brickman and Chandler were acting within the course and scope of their employment with AMAFF.

203. AMAFF is therefore liable for Brickman's and Chandler's discriminatory acts and omissions.

204. As a direct and proximate result of AMAFF's conduct, JAMISON has suffered, and continues to suffer, irreparable injury and monetary damages in the form of past, present, and future lost earnings and other benefits; great emotional distress, mental harm, pain and suffering; and other related damages.

205. AMAFF's conduct was willful, intentional, oppressive, malicious, and done with wanton and reckless disregard for JAMISON's rights, thereby warranting the imposition of punitive damages to be determined at trial.

206. As a result of AMAFF's conduct, JAMISON was required to retain the services of an attorney and, as a direct and foreseeable result, has been damaged and is entitled to reasonable attorney's fees and costs.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment in favor of Plaintiff and against Defendant as follows:

1. For monetary damages for past, present, and future lost earnings;
2. For monetary damages for past, present, and future pain and suffering; and other losses associated with such embarrassment, humiliation, and mental and emotional pain;
3. For punitive damages in an amount to be determined by this Court;
4. For pre-judgment interest, at the highest rate allowable by law;
5. For reasonable attorney fees and costs of suit; and
6. For any such further relief this Court deems appropriate.

DATED this 19th day of December 2023.

LAGOMARSINO LAW

/s/ Taylor Jorgensen
_____
ANDRE M. LAGOMARSINO, ESQ. (#6711)
TAYLOR N. JORGENSEN, ESQ. (#16259)
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
Facsimile: (702) 383-0065
*Attorneys for Plaintiff Jordyn Jamison*

# JURY DEMAND

PLEASE TAKE NOTICE that Plaintiff, by and through her undersigned attorneys, hereby demands a jury trial of all issues in the above-referenced matter.

DATED this 19th day of December 2023.

**LAGOMARSINO LAW**

/s/ Taylor Jorgensen
ANDRE M. LAGOMARSINO, ESQ. (#6711)
TAYLOR N. JORGENSEN, ESQ. (#16259)
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
Facsimile: (702) 383-0065
*Attorneys for Plaintiff Jordyn Jamison*